**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Chad Alan Lee,<br><br>            Petitioner,<br><br>v.<br><br>Charles L. Ryan, et al.,<br><br>            Respondents. | No. CV-01-2178-PHX-GMS<br><br>DEATH PENALTY CASE<br><br>**ORDER** |

This case has been remanded by the Ninth Circuit Court of Appeals, which ordered this Court to reconsider Claims 2, 5, and 6 of Lee's habeas petition in the light of intervening law. (Doc. 135.) The issues have been briefed. (Docs. 141, 150, 153, 167–169.) For the reasons set forth below, the Court finds that the claims remain procedurally defaulted and barred from federal review.

## BACKGROUND

In two separate trials, Lee was convicted and sentenced to death for three murders he committed during a crime spree in April 1992. In the first trial, he was convicted of first-degree murder in the deaths of Linda Reynolds, a pizza delivery woman, and David Lacey, a taxi driver, as well as kidnapping, sexual assault, armed robbery, and theft with respect to Reynolds, and armed robbery with respect to Lacey. Several months later, Lee was convicted of the murder and armed robbery of Harold Drury, a convenience store clerk. The facts surrounding the crimes, as found by the Arizona Supreme Court, are as follows.

On April 6, 1992, Lee, then 19 years old, and David Hunt, 14, called Pizza Hut from a pay phone and placed an order to be delivered to a vacant house. When Linda Reynolds arrived with the pizza order, Lee and Hunt confronted her with a rifle, forced her to remove her shorts and shirt, and abducted her. Lee drove his Pontiac LeMans into the desert with Reynolds, and Hunt drove Reynolds' car to meet them.

Lee removed the stereo and speakers from Reynolds' car and then destroyed the car by smashing windows and various parts with a bat, puncturing the tires, and disabling the engine by cutting hoses and spark plug wires. Lee destroyed Reynolds' car so that she could not escape.

Reynolds was forced to remove her pantyhose, socks, and shoes and to walk barefoot with Hunt in the desert north of her car where he raped her. Hunt then walked Reynolds back toward her car, where Lee forced her to perform oral sex on him.

Lee drove Reynolds and Hunt to Reynolds' bank and forced her to withdraw money from an ATM. She had a little over twenty dollars in her account. Lee and Hunt also forced her to give them the rings from her fingers.

Lee and Hunt then drove Reynolds back to the desert where they had destroyed her car. She momentarily escaped, but Hunt found her and forced her back to the car. When she returned, her face and lips were bloody.

Lee claimed that he and Hunt argued in front of Reynolds about whether to release her. Lee testified that Hunt was opposed to releasing her because she would be able to identify them. While escorting Reynolds away from Hunt, Lee shot her in the head. Lee ran back to the car, got a knife, went back to Reynolds, and stabbed her twice in the left side of her chest. He returned to his car and drove away with Hunt.

Shortly after midnight on April 16, 1992, nine days after the Reynolds murder, Lee called for a cab from a pay telephone at a convenience store. David Lacey's cab was dispatched, and he picked up Lee. Hunt, who had waited near the convenience store, drove Lee's car to the location where he and Lee intended to rob Lacey. When Lacey stopped the cab and turned around to get paid, Lee shot him. He fired nine shots, four of which hit Lacey. Lee removed forty dollars from Lacey's pockets and dumped his body by the side

of the road. With Hunt following, Lee drove the cab to a dirt road where he shot the cab's windows and tires and rifled through its contents. Lee's cigarette lighter and bloody fingerprint on a receipt were later found in the abandoned cab.

After hearing news reports that police had found distinctive shoeprints at the Reynolds and Lacey crime scenes, Lee drove to a forest north of Prescott and burned the shoes he had worn during both murders. He also burned and buried two .22 caliber rifles including the gun he used to shoot Reynolds. Lee left the knife he used to stab Reynolds stuck into a tree at the same location.

Around 1:00 a.m. on April 27, 1992, Lee entered an AM–PM market to purchase some cigarettes. When the clerk, Harold Drury, opened the cash drawer, Lee shot him in the shoulder, causing him to fall backwards. Lee then shot Drury in the top of the head, the forehead, the cheek, and the neck. Drury slumped to the floor. Lee walked around the counter and shot Drury two more times in the right temple. Lee picked up the cigarettes, took the entire cash drawer from the register, and left the store. Hunt was in Lee's car waiting to leave the scene.

Lee removed the cylinder from his revolver and threw both parts into a dumpster. After driving for several miles, Lee and Hunt disposed of the cash drawer in a creek bed

Authorities identified Lee and Hunt as suspects. They were arrested in Flagstaff on unrelated armed robbery charges and transported to Phoenix. In a series of interviews with detectives, Lee confessed to robbing and murdering Reynolds, Lacey, and Drury. He led detectives to the campsite where he had hidden the weapons.

In his first trial, Lee was convicted of two counts of first-degree murder. The court sentenced him to death for the Reynolds and Lacey murders. In his second trial, he was convicted and sentenced to death for the Drury murder.

The convictions and sentences were confirmed on appeal. *State v. Lee (Lee I)*, 189 Ariz. 590, 944 P.2d 1204 (1997); *State v. Lee (Lee II)*, 189 Ariz. 608, 944 P.2d 1222 (1997). After unsuccessfully pursuing postconviction relief (PCR), Lee commenced proceedings in this Court. He filed an amended petition for writ of habeas corpus on March 3, 2003. (Doc. 59.)

In a 2005 order, the Court denied Claims 2, 5, and 6, alleging ineffective assistance of trial and appellate counsel, as procedurally barred. (Doc. 94.) The Court denied Lee's amended petition in 2009. (Doc. 126.)

In 2014, the Ninth Circuit remanded the case and directed the Court to consider the effects of intervening law on Claims 2, 5, and 6. (Doc. 135.) The remand order cited *Martinez v. Ryan*, 566 U.S. 1 (2012); *Dickens v. Ryan*, 740 F.3d 1302 (9th Cir. 2014) (en banc); *Detrich v. Ryan*, 740 F.3d 1237 (9th Cir. 2013) (en banc); *Woods v. Sinclair*, 764 F.3d 1109, 1138 n.16 (9th Cir. 2014); and *Nguyen v. Curry*, 736 F.3d 1287 (9th Cir. 2013).[1] (*Id.*)

## **APPLICABLE LAW**

Federal review is generally not available for a state prisoner's claims when those claims have been denied pursuant to an independent and adequate state procedural rule. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). In such situations, federal habeas review is barred unless the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice. *Id. Coleman* held that ineffective assistance of counsel in post-conviction proceedings does not establish cause for the procedural default of a claim. *Id.*

In *Martinez*, the Court announced a new, "narrow exception" to the rule set out in *Coleman*. The Court explained that:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

566 U.S. at 17; *see also Trevino v. Thaler*, 569 U.S. 413, 423 (2013).

Accordingly, under *Martinez* an Arizona petitioner may establish cause for the procedural default of an ineffective assistance of trial counsel claim by demonstrating that PCR counsel was ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984).

---

[1] *Nguyen* extended *Martinez* to claims of ineffective assistance of appellate counsel. 736 F.3d at 1289. *Nguyen* was subsequently abrogated by *Davila v. Davis*, 137 S. Ct. 2058 (2017). *See Hurles v. Ryan*, 914 F.3d 1236, 1237–38 (9th Cir. 2019).

*Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014), *overruled on other grounds by McKinney v. Ryan*, 813 F.3d 798, 818 (9th Cir. 2015) (en banc). To show ineffectiveness, a petitioner must demonstrate that PCR counsel's performance was deficient and there was a reasonable probability that, absent the deficient performance, the result of the PCR proceedings would have been different. (*Id.*)

Determining whether there was a reasonable probability of a different outcome "is necessarily connected to the strength of the argument that trial counsel's assistance was ineffective." *Id.* at 377–78. The Ninth Circuit has explained that "PCR counsel would not be ineffective for failure to raise an ineffective assistance of counsel claim with respect to trial counsel who was not constitutionally ineffective." *Sexton v. Cozner*, 679 F.3d 1150, 1157 (9th Cir. 2012).

To establish "prejudice" in the *Martinez* context, a petitioner must show that the underlying ineffective assistance of trial counsel claim was "substantial" or had "some merit." *Clabourne*, 745 F.3d at 377 (citing *Martinez*, 566 U.S. at 14).

The *Martinez* exception applies only to claims of ineffective assistance of trial counsel. *Pizzuto v. Ramirez*, 783 F.3d 1171, 1177 (9th Cir. 2015); *Hunton v. Sinclair*, 732 F.3d 1124, 1126–27 (9th Cir. 2013). As relevant here, it does not apply to claims of ineffective assistance of appellate counsel. *Davila v. Davis*, 137 S. Ct. 2058, 2062–63 (2017).

Claims of ineffective assistance of counsel are governed by the principles set forth in *Strickland*. To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. *Id.* at 687–88.

The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S. at 689; *see Wong v. Belmontes*, 558 U.S. 15 (2009) (per curiam); *Bobby v. Van Hook*, 558 U.S. 4 (2009) (per curiam). To satisfy *Strickland*'s first prong, a defendant must

overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.*

With respect to *Strickland*'s second prong, a defendant must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

## DISCUSSION

Pursuant to the remand order, the Court assesses the impact of *Martinez* on the procedurally defaulted Claims 2, 5, and 6.

### Claim 2

In Claim 2 of his amended habeas petition, Lee alleged that trial counsel provided ineffective assistance by failing to investigate and present mitigation evidence during the sentencing phase of Lee's trials. (Doc. 59 at 96.) Lee did not raise the claim in state court and this Court dismissed it as procedurally barred. (Doc. 94 at 9.)

Lee's principal allegation is that despite "tantalizing indications" trial counsel failed to pursue evidence that Lee was exposed to alcohol *in utero*. (Doc. 141 at 14.) Lee asserts that "[he] was born with neurological impairments consistent with a diagnosis of Fetal Alcohol Effect (FAE) or Alcohol Related Neurodevelopmental Disorder (ARND)."[2] (*Id.* at 18.) Lee argues he was prejudiced by counsel's performance because evidence of FAE "would have provided the 'explanation' the judge sought" for why Lee committed the murders. (*Id.* at 15.) Finally, Lee alleges that PCR counsel performed ineffectively in failing to raise the claim so its default is excused under *Martinez*. (*Id.* at 9–13.)

Trial court proceedings:

Lee was represented by attorney Alan Simpson. Prior to trial, Simpson moved to have Lee's confessions suppressed. (ROA 66.)[3] At a hearing on the motion, Simpson presented testimony from Dr. Mickey McMahon, a psychologist, who testified that Lee

---

[2] The Court will use the term FAE when discussing Lee's allegations in Claim 2.
[3] "ROA" refers to four volumes of sequentially-numbered documents in the Drury record on appeal filed with the Arizona Supreme Court in Case No. CR-94-0367-AP.

- 6 -

suffered from Attention Deficit Disorder (ADD), was submissive to authority, and had difficulty processing information. (RT 1/28/94 at 163–86.)[4]

After the jury found Lee guilty of the Reynolds and Lacey murders, Simpson filed a "Disclosure of Mitigation" listing mitigating circumstances and naming Dr. McMahon as an expert witness for the sentencing hearing. (ROA 118.) Before the hearing, Simpson filed a sentencing memorandum contesting the alleged aggravating circumstances and asserting eight mitigating circumstances. (ROA 130.)

Simpson also sent a letter to Lisa Miller, the probation officer who was preparing Lee's pre-sentence report. (Doc. 150, Ex. A.) In the letter, Simpson described Lee's emotionally-deprived childhood and Dr. McMahon's opinion that Lee had a dependent and submissive personality. (*Id.*) Simpson argued that grounds existed to spare Lee's life because Lee would never have committed the crimes if he had not fallen under the influence of co-defendant Hunt. (*Id.*) Simpson also attached a letter from Lee describing his deprived childhood and his future aspirations. (*Id.*, Attach.)

Miller wrote a 14-page pre-sentence report. (ROA 136.) The report noted Dr. McMahon's opinion that Lee suffered from Post-Traumatic Stress Disorder (PTSD) and ADD and that these disorders "likely cause the defendant to be a follower and may help to explain the defendant's behavior and why Mr. Hunt had a significant role in directing the defendant's actions during these offenses." (*Id.* at 7.) The report also contained information about Lee's "unstable social history," his father's emotional unavailability, his mother's excessive drinking, his poor academic performance, and an incident of sexual abuse. (*Id.* at 8.)

On July 12, 1994, Simpson filed a "Supplemental Memorandum on Mitigation," along with the transcript of a deposition of Lee, to support the mitigating circumstances of remorse, deprived childhood, school failure, positive future goals, and love of family. (ROA 141.) Simpson also attached a note from Lee's father, Gary, "begging for his son's

---

[4] "RT" refers to the court reporter's transcripts.

life." (*Id.*, second attachment.) Simpson reiterated the eight mitigating circumstances he had previously submitted and listed six additional mitigating circumstances. (*Id.* at 2–3.)

The trial court held a combined sentencing hearing on the Reynolds and Lacey murder convictions. (RT 6/6/94 at 3.) Simpson called Richard Bailey, the administrator of the classification section of the Maricopa County Sheriff's Office. (RT 6/6/94 at 11.) Bailey testified that Lee had been in closed custody for the past year and his conduct there "has been much better than average." (*Id.* at 26.)

Simpson then called defense investigator Ed Aitken. (*Id.* at 42.) Aitken had interviewed Lee's father, mother, and three of his siblings; interviewed neighbors Richard and Mary Sutter; and obtained all of Lee's school records. (*Id.* at 43–44, 58.)

Aitken testified about Lee's family life and childhood. (*Id.* at 44-61.) He testified that "there wasn't a great deal of prenatal care" and that Lee's mother "abused alcohol for a number of years, including prior to his birth." (*Id.* at 46.) Lee's father "would furnish her a case of beer every other day" and Lee's sister Sandra "augmented" that supply "with two 12-packs in between." (*Id.* at 45–47.)

Due to a "lack of maternal interest," Lee spent most of his first four years living with the Sutter family. (*Id.* at 50.) The Sutters provided all his clothes, food, and diapers. (*Id.*) Lee preferred living with the Sutters and did not want to return home. He viewed the Sutters as parental figures. (*Id.*) Lee's relationship with the Sutters diminished and finally ended when his family moved away. (*Id.* at 51–53.)

The Lee children worked for their father, cutting and collecting wood. (*Id.* at 53.) There was little time for schoolwork or a social life. (*Id.* at 54–55.) Neither parent displayed affection for the children, except for the youngest son, Eric, who was "a slow learner at best." (*Id.*) Lee looked out for Eric. (*Id.* at 55.)

Lee's parents divorced when he was 14 or 15. He moved in with his father. (*Id.* at 55–56.) Lee did construction work and left high school in his sophomore year. (*Id.* at 56–57.)

/ / /

Aitken testified that the people he interviewed agreed that Lee was a "follower not a leader" and was the "most introspect [sic]" and "least assertive" of his siblings. (*Id.* at 59.) Aitken noted that Lee, from age 15, when he stole a bicycle, to age 19, when he met co-defendant Hunt, had no involvement with the criminal justice system. (*Id.* at 59, 62.) Aitken testified that Hunt "was aggressive and a bad character and had been involved in some law violations." (*Id.* at 60.)

Next, Simpson called Dr. McMahon. (RT 6/7/94 a.m. at 3–4.) Dr. McMahon testified that Lee suffered both from maternal and paternal abandonment. (*Id.* at 7–8, 12–13.) He noted that Lee's mother had "a history of severe alcohol abuse" and "habitually sent [Lee] out of the home to get him out of her hair." (*Id.* at 8.) Lee "ping-ponged" back and forth between his own home and the Sutters's. (*Id.* at 9–10.) Lee's father was also unsupportive and emotionally unavailable. (*Id.* at 12–14.)

Dr. McMahon testified that a consequence of this type of abandonment is difficulty in forming proper bonds, while the desire to bond can lead a person "to the wrong places." (*Id.* at 11.) Socialization is also affected. (*Id.* at 12.) The anxiety produced in social settings "interferes with their cognitive processing so they don't always select the right kind of people." (*Id.*)

Dr. McMahon testified that Lee suffered from ADD, which contributed to his failure in school. (*Id.* at 16.) Lee's difficulties in school and problems with socialization hindered his ability to form close friendships and relationships with the opposite sex and delayed his progress into adulthood. (*Id.* at 20–21.)

As a result, Lee began associating with a group of individuals that included co-defendant David Hunt. (*Id.* at 21.) Lee was about 18 years old and Hunt was around 14. (*Id.* at 22.) Dr. McMahon testified that, although usually the older person is the leader, in this case Lee did not exhibit any signs of leadership. (*Id.* at 23–24.)

Testing performed by Dr. McMahon showed that Lee had the personality of a follower. Results of the "16 Personality Factor Test" showed that Lee was dependent, submissive, shy, and timid. (*Id.* at 27–29.) The "Gud Johnson suggestibility test" also supported the conclusion that Lee was not a leader. (*Id.* at 32–36.) Lee scored in the 99th

percentile on compliance and the 96th percentile on suggestibility. (*Id.* at 34–37.) The results of the "Williamson sentence completion test" were consistent with information showing that Lee was anxious, naïve, and a loner. (*Id.* at 38–39.)

Dr. McMahon also testified that he had reviewed medical records regarding Lee's maternal grandfather, Robert Olson. (*Id.* at 30.) Olson had been diagnosed with "schizophrenia, paranoid type." (*Id.*) Like Lee, he was a loner and did not socialize with others. According to Dr. McMahon, those factors were apparently "passed on from one generation to the next." (*Id.* at 30–31.)

Dr. McMahon also concluded that Lee had a significantly compromised ability to perceive reality and difficulty appreciating situations he was in and the consequences of his actions. (*Id.* at 44.) In support of these findings, Dr. McMahon cited the "Clinical Analysis Questionnaire," which showed high scores in three categories: (1) "confusion and self doubt"; (2) "hallucinates, distorts reality"; and (3) "blames self and feels guilty." (*Id.* at 41–43.) Dr. McMahon also administered the Rorschach test, which showed that Lee's perception of reality was poor. (RT 6/7/94 p.m. at 3–4.) Finally, McMahon administered the Barkley "Children's Atypical Developmental Skill" test, which supported the diagnosis of ADD and the observations of Lee's father that Lee lived a "fantasy kind of life with poor reality contact." (*Id.* at 4.)

Dr. McMahon elaborated on the practical effects of Lee's ADD and separation/abandonment anxiety. (*Id.* at 47–49.) He explained that these conditions compromise and interfere with concentration and information-processing. (*Id.* at 48.) According to Dr. McMahon, Lee was "trying to operate with a brain that's not quite functioning 100 percent because of the attention deficit problems." (*Id.* at 49.)

Finally, Simpson called Mary Sutter. She testified that when Lee was about three months old, the Sutters became his primary caregivers and he became a part of their family. (*Id.* at 53–55.)

Sutter testified about her observations of Lee and his homelife. She stated that the Lee house was messy and that Lee's parents did not interact with the children. (*Id.* at 52–

53.) The Lee children were poorly dressed, and Lee was teased at school. (*Id.* at 63.) Sutter testified that Lee had no friends or girlfriends. (*Id.* at 64.) She characterized his childhood as "deprived." (*Id.* at 69.)

Sutter also testified about Lee's character and behavior. She never saw Lee acting "badly" toward anyone. (*Id.* at 68.) He was protective of his younger brother, Eric, who was a little "slow." (*Id.*) She described Lee as a "[s]weet, loving child." (*Id.*)

Sutter testified that she had visited Lee in jail and talked with him on the phone. (*Id.* at 69–70.) She attended most of the trial. (*Id.* at 70.) Despite the murders, the Sutters still saw in Lee the child they used to know. (*Id.*) Sutter testified that it would be "devastating" to them if Lee were executed. (*Id.*)

At the close of testimony, Simpson offered excerpts of an interview with Lee's girlfriend, Lucy Sierra, and copies of a statement Sierra made during an interview with the prosecutor and defense counsel. (*Id.* at 83–86.)

On the day of sentencing, Simpson discussed the proffered mitigating circumstances: Lee's age and immaturity; conduct in jail; the family background that led him to associate with Hunt; lack of prior criminal history; mental impairment; Hunt's "non-death" sentence and the fact that Hunt was the leader and Lee the follower; conviction for felony-murder; mitigating aspects of the prior conviction; full cooperation with law enforcement; poor education and ADD; gang association due to need to be accepted; prior sexual victimization; remorse; love of family and effect his execution would have on them; and positive future goals. (RT 6/23/94 at 2–9.) Simpson also argued that Lee was not in the same category as other death row inmates. (*Id.* at 9.)

In sentencing Lee to death, the court found four aggravating circumstances with respect to each murder: conviction of another crime for which a life sentence was imposable; prior conviction of a crime involving the use or threat of violence on another person; pecuniary gain; and especially cruel, heinous, or depraved. (*Id.* at 20–27, 32.)

The court found Lee's age was a statutory mitigating circumstance. The court also found several non-statutory mitigating circumstances: lack of significant prior criminal

history; deprived childhood; post-arrest cooperation with law enforcement; and expression of remorse. (*Id.* at 28–30, 32.) The court listed other circumstances it had considered but found not mitigating. (*Id.* at 30–31.) It found that McMahon's ADD diagnosis "does not constitute mental impairment such as would lead the defendant to the crimes committed or mitigate his actions in any way." (*Id.* at 31.)

The court stated it had considered the mitigating circumstances proven by the defense both "individually and collectively." (*Id.* at 32.) With regard to each murder, the court found that the mitigation was not "sufficiently substantial to call for leniency" and sentenced Lee to death. (*Id.* at 33–34.)

After Lee's subsequent conviction for the Drury murder, the parties stated they had no additional evidence to offer. (RT 10/5/94 at 2–3.) Simpson asked the court to consider "all the evidence we placed in mitigation at the previous proceeding at sentencing." (*Id.* at 3.) He offered new arguments regarding two of the aggravating circumstances (*Id.* at 4.) He argued that neither the especially cruel, heinous, or depraved nor the pecuniary gain factor had been proven for Drury's murder. (*Id.* at 5–8.)

The court found the same aggravating factors and mitigating circumstances as before and again sentenced Lee to death.  (*Id.* at 22.)

PCR proceedings:

During the PCR proceedings, Lee was represented by Jess Lorona. Lorona filed a 40-page PCR petition raising 17 issues, including one claim of ineffective assistance of counsel with five sub-claims. (Doc. 141, Ex K.) The sub-claims included allegations that trial counsel performed ineffectively by failing "to provide to the trial court specific examples of prejudice resulting from the trial court's failure to appoint a second attorney"[5] and failing "to establish a nexus between his deprived childhood and his crimes." (*Id.*) The

---

[5] Prior to trial, Simpson moved for the appointment of second counsel. The trial court denied the request. The Arizona Supreme Court found that the trial court did not abuse its discretion in denying the request, *Lee I*, 189 Ariz. at 601, 944 P.2d at 1215, and this Court denied Lee's habeas claim alleging a violation of his due process and Sixth Amendment rights. (Doc. 106 at 2–3.)

PCR court denied relief. [6] (ROA-PCR 244, ME 12/28/2000.) The court considered Lee's ineffective assistance of counsel claims on the merits but found neither deficient performance nor prejudice. (*Id.* at 5–7.)

With respect to Lee's claim that counsel was ineffective for failing to provide the court with evidence to warrant the appointment of second counsel, the court noted that "in fact counsel did articulate reasons in the notice." (*Id.* at 6.) The court added, "Most important as to this sub-claim however, is the fact that Defendant was not prejudiced by not having second counsel because first, his attorney did a very good job in representing Defendant, and second, the result with more than one attorney would not have been different." (*Id.*)

Regarding Lee's claim that counsel failed to establish a "nexus" between his deprived childhood and his crimes, the court found that:

> counsel provided the Court with much evidence as to Defendant's deprived childhood and the Court considered it as a mitigating factor. The Court didn't have to have counsel "draw a line" to show the nexus, but that childhood could not overcome the aggravating factors found by the Court in these homicides. Therefore, Defendant cannot demonstrate prejudice on this sub-claim.

(*Id.* at 7.)

Analysis:

To excuse the default of this claim under *Martinez*, Lee must establish that PCR counsel's performance was both deficient and prejudicial. *Martinez*, 566 U.S. at 14; *Clabourne*, 745 F.3d at 377.

Respondents argue that Simpson did not perform deficiently at sentencing. (Doc. 150 at 24.) They note that Simpson considered the possibility of damage from prenatal alcohol exposure, but did not pursue the issue after his mental health expert, Dr. McMahon, rejected it. (*Id.*) Respondents also assert that at time of Lee's trial, FAE was not a

---

[6] Maricopa County Superior Court Judge Ronald Reinstein presided over the trial, sentencing, and PCR proceedings.

recognized condition in adults, making Simpson's decision not to pursue the issue even more reasonable. (*Id.* at 43–44.) Finally, Respondents contend that Lee cannot show he was prejudiced by Simpson's performance "because the speculative evidence of damage from FAE would not have changed the sentences, in light of all the aggravating circumstances and the totality of the evidence." (*Id.*)

Lee contends that Simpson performed deficiently by relying on Dr. McMahon.[7] Instead, according to Lee, because Simpson was aware that FAE was a potential issue, he should have consulted an "appropriate expert." (Doc. 153 at 8.) Lee argues that he was prejudiced because "appropriate expert testimony could have refuted the sentencing court's belief that Lee was the leader and Hunt the follower." (*Id.* at 12.)

In support of these allegations, Lee has presented declarations from Simpson and two experts: Dr. Thomas Thompson, a neuropsychologist, and Dr. Christopher Cunniff, a pediatrician and medical geneticist. (Doc. 143, Ex's M, P, and R.) Simpson states that he discussed the issue of prenatal alcohol exposure with Dr. McMahon. (*Id.*, Ex. M at 2.) Dr. McMahon responded that Lee "did not display the 'facial characteristics' of a child with fetal alcohol syndrome" and therefore dismissed the possibility that Lee suffered any neurological impairment as a result of *in utero* alcohol exposure. (*Id.* at 2–3.) Simpson explains that, "Trusting Dr. McMahon's assessment of the fetal alcohol exposure issue, I did not seek the advice or opinion of another expert on this issue." (*Id.* at 3.) Simpson further states that if he had been authorized to retain second counsel, he would have sought an attorney experienced in mitigation, particularly in mental health issues. (*Id.*)

Dr. Thompson opines that Lee's "early childhood deficits" were "consistent" with FAE. (Doc. 143, Ex. P at 3.) Specifically, Dr. Thompson states that neuropsychological testing and QEEG testing showed deficits in neuropsychological functioning "consistent with a pattern frequently observed by this neuropsychologist in older adolescents and young adults with FAS, FAE, and ARND." (*Id.* at 16–17.) He cites other risk factors

---

[7] Lee asserts that Respondents "fail to rebut Claim 2." (Doc. 153 at 4.) Of course, it is the petitioner who bears the burden establishing ineffective assistance of counsel. *Strickland*, 466 U.S. at 689.

including "major mental illness in Leslie's [Lee's mother's] biological family" and Lee's dysfunctional physical environment, lack of maternal attachment, and "disorganized family relationships." (*Id.* at 12–15.) These factors "resulted in [Lee's] vulnerability to his younger, antisocial co-defendant, Mr. Hunt." (*Id.* at 18–19.) According to Dr. Thompson, focusing on FAE "would have helped explain Chad's failure to attain appropriate adult developmental maturity and the inadequacies of judgment that characterized his relationship with his co-defendant, David Hunt." (*Id.* at 7.)

Dr. Thompson also states that at the time of Lee's 1994 trial, "alcohol exposure *in utero* was well known to have a major teratogenic impact on the central nervous system (brain) of the developing fetus" and that "[t]he importance of focusing evaluation resources on the issue of *in utero* alcohol exposure would have been apparent to an experienced forensic psychological examiner in 1994." (*Id.* at 5, 7.)

Dr. Cunniff opines that Lee "had intellectual and behavioral features caused by prenatal exposure to alcohol." (Doc. 143, Ex. R at 2.) These features, including "poor school performance, poor grasp of behavioral consequences, and difficulty in completing tasks," are "characteristic of individuals who suffer the adverse effects of prenatal alcohol exposure." (*Id.* at 2–3.)

Simpson's performance was not deficient. Nor was it prejudiced. First, Simpson did not perform unreasonably in relying on Dr. McMahon's conclusion that Lee did not display symptoms of FAS. If Dr. McMahon was incorrect in his assessment of Lee's condition, that error does not reflect a failure on counsel's part. An "expert's failure to diagnose a mental condition does not constitute ineffective assistance of counsel, and [a petitioner] has no constitutional guarantee of effective assistance of experts." *Earp v. Cullen*, 623 F.3d 1065, 1077 (9th Cir. 2010). Simpson was not obligated to seek a second opinion. *See Stokley v. Ryan*, 659 F.3d 802, 813 (9th Cir. 2011) ("[N]either of the experts counsel hired unequivocally stated that Stokley should be examined by a neuropsychologist—and counsel was under no obligation to seek neuropsychological testing in the absence of any such recommendation."); *Babbitt v. Calderon*, 151 F.3d 1170,

1174 (9th Cir. 1998) ("[C]ounsel did retain medical experts whom he thought well-qualified. The experts he had retained did not state that they required the services of . . . additional experts. There was no need for counsel to seek them out independently.").

Lee cites *Caro v. Woodford*, 280 F.3d 1247 (9th Cir. 2002), in which the Ninth Circuit held that counsel's failure to investigate potential brain damage constituted ineffective assistance of counsel. In *Caro*, defense counsel was aware of the defendant's "extraordinary history of exposure to pesticides and toxic chemicals," but failed to investigate potential defenses or provide experts with the information necessary to evaluate his brain damage. *Id.* at 1254–55. In Lee's case, by contrast, Dr. McMahon was aware that Lee's mother reportedly consumed alcohol while pregnant with Lee. He and Simpson had discussed the issue, and he informed Simpson that Lee did not have the characteristics of FAE. While Drs. Thompson and Cunniff now opine that Lee has features consistent with prenatal alcohol exposure, "[l]ater disagreement by other experts as to the conclusions does not demonstrate a violation of *Strickland*." *Fairbank v. Ayers*, 650 F.3d 1243, 1252 (9th Cir. 2011). As the district court stated in *Carter v. Chappell*, No. 06-cv-1343 BEN (KSC), 2013 WL 1120657, at *92 (S.D. Cal. March 18, 2013), "the Court's examination of counsel's performance is limited to whether counsel was deficient in failing to investigate and present such evidence, not merely whether it was 'possible' to render a diagnosis of FAS, an area of research that was admittedly new, undeveloped, and had not been applied to adults, at the time of trial."[8]

Having received Dr. McMahon's opinion that FAE was not an issue, Simpson pursued a reasonable alternative strategy at sentencing. He attempted to explain why Lee, who had no prior record of violence, committed three murders at age 19 after becoming acquainted with co-defendant Hunt. To that end, Simpson presented evidence that Lee was immature, submissive, emotionally needy, and a follower. As causes of these personality

---

[8] Respondents also cite *Sells v. Thaler*, 2012 WL 2562666, *58 (W.D. Tex. June 28, 2012), in which the district court found that, "At the time of petitioner's 2000 capital murder trial, 'fetal alcohol syndrome' and 'fetal alcohol effects' were terms only just beginning to find acceptance among the mainstream within the mental health community. Neither term appears in the 2000 edition of the DSM–IV–TR."

traits, Simpson cited parental abandonment, a disruptive and deprived childhood, and ADD. Lee's background and personality left him susceptible to the influence of someone like Hunt.

Simpson's performance at sentencing was "well within the range of professionally reasonable judgments." *Van Hook*, 558 U.S. at 12 (quoting *Strickland*, 466 U.S. at 699). In *Van Hook*, defense counsel spoke with the defendant's mother, father, aunt, and a family friend; met with two expert witnesses; reviewed military and medical records; and considered retaining a mitigation specialist. *Id.* at 9–10. Counsel presented mitigating evidence about the defendant's traumatic childhood and his impairment on the day of the crime. *Id.* The Court found that the scope of counsel's investigation was reasonable even though counsel did not interview all of the defendant's relatives or the psychiatrist who treated his mother. *Id.* at 11. By this standard, Simpson's performance was reasonable. This is not a case, like *Wiggins v. Smith*, 539 U.S. 510 (2003), where counsel conducted only a truncated investigation and presented no mitigating evidence of the petitioner's troubled background.

Finally, Judge Reinstein, who presided over both Lee's trial and the PCR proceedings, found that Simpson did a "very good job" in representing Lee. (ROA-PCR 244, ME 12/28/2000 at 6.) The judge's familiarity with the record and with Simpson's performance is entitled to deference. *See Schurz v. Ryan*, 730 F.3d 812, 816 (9th Cir. 2013) ("We are particularly confident in so concluding [that Schurz was not prejudiced by counsel's performance] in light of the fact that the judge who sentenced Schurz already reviewed much of the 'new' evidence through the state post-conviction process, and found it insufficient to change the sentence from death.").

Lee argues that he was prejudiced by Simpson's performance because evidence of FAE would have provided a more persuasive explanation of his conduct in becoming involved with Hunt and being led to commit the murders. In assessing prejudice, courts "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534. The "totality of the available evidence" includes "both that

adduced at trial, and the evidence adduced" in subsequent proceedings. *Id*. at 536 (quoting *Williams v. Taylor*, 529 U.S. 362, 397–98 (2000)). Having performed that assessment, the Court finds there was not a reasonable probability of a life sentence if Simpson had presented the FAE evidence he now offers.

First, any argument that Lee was a follower is belied by the facts of the crimes. As the Arizona Supreme Court explained in rejecting Lee's argument that his status as a follower was a mitigating circumstance: "the trial court properly rejected defendant's claim that he was merely a follower when he was armed with his own weapons in both murders, initiated both robberies by making the phone calls, pulled the trigger in both murders, and stabbed Reynolds." *Lee I*, 189 Ariz. at 607, 944 P.2d at 1221.

Proposing FAE as the cause of the personality traits that made him a follower would not have altered the fact that Lee took the lead role in the murders and robberies.

Next, Simpson's sentencing presentation led the trial court to find that a number of mitigating circumstances had been proved. For the Reynolds and Lacey murders, the court found four non-statutory mitigating circumstances. (RT 6/23/94 at 28–30, 32.) For the Drury murder, the sentencing court found three non-statutory mitigating circumstances. (RT 10/5/94 at 17–21.) One of the mitigating circumstances was Lee's deprived childhood. The court found that Lee's "childhood in his own home was clearly dysfunctional"; his parents "seemingly never gave [him] any affection"; his mother was a heavy drinker; he was shuttled back and forth to the Sutter home; and his father "provided nothing . . . as far as being a role model" and "almost treated [Lee] as chattel." (*Id.* at 29.)

In addition, given the strength of aggravating circumstances, there was not a reasonable probability of a different sentence if Simpson had presented evidence of FAE. The trial court found the same four aggravating factors with respect to each of the three murders. One of these factors, that Lee had committed other murders, is "the most powerful imaginable aggravating evidence." *Belmontes*, 558 U.S. at 28. Another—the especially cruel, heinous, or depraved aggravating factor—was particularly powerful with respect to the murder of Linda Reynolds, who was kidnapped, robbed, and sexually assaulted before Lee shot and then stabbed her. (*See* RT 6/23/94 at 24–26.) As the trial court found, her

murder was "senseless" because "[a]ny of the other crimes could have been committed without murdering Mrs. Reynolds." (*Id.* at 26.) The murder netted Lee twenty dollars, a car radio, and some jewelry. *See Belmontes*, 558 U.S. at 27 ("The jury also heard that this savage murder was committed solely to prevent interference with a burglary that netted Belmontes $100 he used to buy beer and drugs for the night. McConnell suffered, and it was clearly needless.").

As Respondents note, courts have found that the omission of FAE evidence at sentencing did not result in prejudice where other mitigating evidence was presented. *See Williams v. Calderon*, 52 F.3d 1465, 1471 (9th Cir. 1995) (finding no prejudice from counsel's failure to present evidence of fetal alcohol syndrome where additional mitigating evidence was offered at guilt phase and the crime was "grievous"); *Carter v. Chappell*, 2013 WL 1120657, at *99 (rejecting claim that additional mitigating evidence of fetal alcohol syndrome might have affected the jury's verdict); *Sells v. Stephens*, 536 F. App'x 483, 495 (5th Cir. 2013) (finding no prejudice from omission of evidence of fetal alcohol impairment where trial evidence established that petitioner "suffered from serious personality and adaptive impairments for which he bore no blame").

In *Schriro v. Landrigan*, 550 U.S. 465 (2007), the Supreme Court found that the petitioner was not prejudiced by the omission of mitigation evidence, including evidence "[that] he was exposed to alcohol and drugs *in utero*, which may have resulted in cognitive and behavioral deficiencies consistent with fetal alcohol syndrome." *Id.* at 550 (citation omitted). The Court characterized the omitted evidence as "weak" and held that it would not have changed the result at sentencing. *Id.* at 481.

Accordingly, adding evidence of FAE to the mitigating evidence Simpson did present at sentencing would not have outbalanced the aggravating factors. Lee was not prejudiced by Simpson's performance at sentencing.

/ / /

/ / /

/ / /

Conclusion:

Simpson did not perform deficiently by failing to pursue evidence of FAE at sentencing. The allegation of ineffective assistance of trial counsel is therefore meritless, and PCR counsel's failure to raise the claim was neither deficient nor prejudicial. Lee's default of this claim is not excused under *Martinez. See Sexton*, 679 F.3d at 1157. Claim 2 remains barred from federal review.

## **Claims 5 and 6**

In Claim 5 of his amended habeas petition, Lee alleged that trial counsel performed ineffectively by failing to challenge for cause or exercise a peremptory strike against a juror, Moises Piñeda, who did not understand English. (Doc. 59 at 107.) Lee did not raise this claim in state court and the Court found the claim procedurally barred. (Doc. 94 at 13–14.) In Claim 6, Lee alleged that appellate counsel performed ineffectively by failing to challenge the trial court's failure to remove the juror. (Doc. 59 at 109.) The Court also found this claim procedurally barred. (Doc. 94 at 14.) The Court rejects Lee's contention that the ineffective assistance of PCR counsel excuses the default of these claims. (*See* Doc. 141 at 30.)

In Claim 4 of his amended habeas petition, Lee alleged that his right to a fair jury trial was violated when the trial court failed to dismiss the juror for cause. (Doc. 59 at 105.) Lee asserted, on the basis of an affidavit acquired from Mr. Piñeda during these habeas proceedings, that Piñeda "did not understand English" and "did not have a good understanding of the proceedings." (*Id.*; *see* Doc. 148, Ex. Z.) The Court found this claim procedurally barred as well (Doc. 94 at 13), but alternatively addressed the claim on the merits and found it did not entitle Lee to relief. (Doc. 125 at 7.)

The Court explained its denial of Claim 4 as follows:

> Although the juror was more comfortable with Spanish than English, he indicated he could follow the judge's oral instructions and would ask for assistance with any words he did not know. Petitioner has proffered no admissible evidence to suggest that Piñeda failed to understand the proceedings, failed to follow the law as instructed, or was biased against Petitioner. The trial judge was in the best position to determine Piñeda's qualifications to serve as a juror and conducted an extensive colloquy. Petitioner's counsel did not challenge Piñeda's qualification to sit on the

panel or exercise a peremptory strike against him. Nothing in the record indicates that Piñeda was not competent to serve on the jury. Accordingly, the Court finds that Petitioner is not entitled to habeas relief on this claim.

(*Id* at 7.) (citations omitted).

In making its ruling the Court refused to consider the juror declaration under *Tanner v. United States*, 483 U.S. 107, 126 (1987), and Rule 606(b) of the Federal Rules of Evidence. (*Id.* at 6–7.) Lee's contention that the Court's interpretation of Rule 606(b) was "overly broad," (Doc. 153), is incorrect. As the Court previously explained, evidence of juror bias or competency is admissible in a post-trial proceeding only with respect to whether "extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." Fed. R. Evid. 606(b). Piñeda's proficiency in English is an internal rather than an external consideration and does not fit within the Rule 606(b) exception. *See Tanner*, 483 U.S. at 119.

Because the underlying claim is without merit, trial counsel did not perform ineffectively in failing to raise it. "Counsel's failure to make a futile motion does not constitute ineffective assistance of counsel." *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994). PCR counsel therefore did not perform ineffectively in failing to raise a claim of ineffective assistance of trial counsel. *Sexton*, 679 F.3d at 1157. Claims 5 and 6 remain procedurally barred. Claim 6 is also barred because *Martinez* applies only to claims of ineffective assistance of trial counsel. *Davila*, 137 S. Ct. at 2062–63.

**EVIDENTIARY DEVELOPMENT**

In his supplemental *Martinez* brief, Lee seeks the following forms of evidentiary development: (1) expansion of the record to include the exhibits submitted with his brief (Docs. 141-1–148, Ex's. A–AA); (2) depositions of trial counsel Simpson, appellate counsel, and PCR counsel Lorona; and (3) an evidentiary hearing. (Doc. 141 at 37, 40.)

Respondents do not object to expanding the record to include materials relevant to Claim 2. (Doc. 150 at 69.) They object to expanding the record to include the material proffered in support of Claims 5 and 6. (*Id.* at 70–71.) The Court has already determined

that it will not consider the juror declaration, so the Court will expand the record to include Exhibits A–AA, excluding Exhibit Z. Discovery and an evidentiary hearing, however, are not necessary and those requests will be denied.

For claims to which *Martinez* applies, "the district court should allow discovery and hold an evidentiary hearing where appropriate to determine whether there was 'cause' under *Martinez* for the state-court procedural default and to determine, if the default is excused, whether there has been trial-counsel IAC." *Detrich*, 740 F.3d at 1246.

Respondents object to Lee's requests for discovery and an evidentiary hearing. The Court agrees that Lee has failed to show "good cause" to depose his trial, appellate, and PCR counsel as required for discovery under Rule 6 of the Rules Governing § 2254 Cases. The record contains Simpson's declaration and the evidence, including the FAE diagnosis, that Lee contends was omitted at sentencing. Lee does not specify what additional information would be gained by deposing counsel.

Next, having reviewed the entire record, including the evidence presented by Lee with his supplemental *Martinez* brief, the Court concludes that an evidentiary hearing is not warranted. *See* Rule 8(a), Rules Governing § 2254 Cases. There are no contested facts concerning Lee's counsel, and Lee has failed to indicate what evidence he seeks to develop at a hearing. Further, the Court has found Claim 2, 5, and 6 without merit on the facts alleged so a hearing is unnecessary. *See Sexton*, 679 F.3d at 1161 (finding the record "sufficiently complete" with respect to underlying ineffective assistance of trial counsel claim); *cf. Dickens*, 740 F.3d at 1321 (explaining that "a district court may take evidence to the extent necessary"). Accordingly, the Court denies Lee's request for an evidentiary hearing.

## **CERTIFICATE OF APPEALABILITY**

Pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure, an applicant cannot take an appeal unless a certificate of appealability has been issued by an appropriate judicial officer. Rule 11(a) of the Rules Governing Section 2254 Cases provides that the district judge must either issue or deny a certificate of appealability when it enters a final

order adverse to the applicant. If a certificate is issued, the court must state the specific issue or issues that satisfy 28 U.S.C. § 2253(c)(2).

Under § 2253(c)(2), a certificate of appealability may issue only when Lee "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court finds that reasonable jurists could debate its resolution of remanded Claim 2.

## **CONCLUSION**

Based on the foregoing,

**IT IS ORDERED** that Claims 2, 5, and 6 are **DENIED** as procedurally barred.

**IT IS FURTHER ORDERED** that Lee's request to expand the record with the materials attached to his supplemental brief (Docs. 141–148), with the exception of Ex. Z, is **GRANTED**. His requests for discovery and an evidentiary hearing are **DENIED**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **GRANTED** as to Claim 2.

Dated this 26th day of June, 2019.

_____
G. Murray Snow
Chief United States District Judge

- 23 -